IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| MARK LINCOLN, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | CIVIL NO. JKB-19-2741 |
| FORD MOTOR COMPANY, *et al.*, | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

Plaintiff Mark Lincoln, a recent purchaser of two Ford F-150 trucks, brought a putative class action suit against Ford Motor Company ("Ford") and John Does 1 through 10 (collectively "Defendants") after allegedly experiencing difficulties with steering his trucks. Under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d),[1] Lincoln, who lives in Delaware and purchased used F-150 trucks in both Delaware and Maryland, brought multiple products liability and contract claims under Maryland, Delaware, and federal law. (Compl., ECF No. 1.) Defendants moved to dismiss all of these claims. (First Mot. Dismiss, ECF No. 6.) Lincoln then filed an amended complaint reasserting his earlier claims and adding New Mexico resident Arthur Buege as a named plaintiff—along with several new claims under New Mexico law. (Am. Compl., ECF No. 9.) Once again, Defendants moved to dismiss this Amended Complaint in its entirety. (Mot. Dismiss, ECF No. 15.) Defendants' motions to dismiss are fully briefed and no hearing is required.

---

[1] The Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), confers original jurisdiction to federal district courts over class actions in which (1) the class is comprised of at least one hundred plaintiffs, § 1332(d)(5)(B), (2) any member of the class of plaintiffs is a citizen of a state different from any defendant, § 1332(d)(2)(A), and (3) the amount in controversy exceeds $5,000,000, exclusive of interest and costs. 28 U.S.C. § 1332(d)(2); *Bartnikowski v. NVR, Inc.*, 307 F. App'x 730, 734 (4th Cir. 2009). Plaintiffs assert that each of CAFA's requirements is met, (Am. Compl. ¶ 14), and defendants do not challenge Plaintiffs' assertions under CAFA. The Court will evaluate the sufficiency of Plaintiffs' putative class action under Fed. R. Civ. P. 23 at a later stage.

*See* Local Rule 105.6 (D. Md. 2018). For the reasons set forth below, Defendants' first motion to dismiss is denied as moot and Defendants' second motion to dismiss is granted in part and denied in part.

## I.    *Background*[2]

Plaintiffs Lincoln and Buege (collectively "Plaintiffs") brought this class action suit on behalf of "current and former owners and lessees of 2015 to 2019 Ford F-150 trucks," alleging that all of these trucks have a latent steering defect that can appear under a wide variety of driving conditions. (Am. Compl. ¶¶ 1, 4.) Plaintiffs allege that Ford "manufactured, sold, and warranted" the F-150 trucks; "Ford and/or its agents, divisions, or subsidiaries designed, manufactured, and installed the steering system on the Class Vehicles"; and the unnamed Doe defendants acted as Ford's agents or employees. (*Id.* ¶¶ 46–48.) Further, Plaintiffs allege that Ford knew of the F-150s' defect, which allegedly "causes the steering wheel to pull to the left or right, and/or a temporary loss of steering control, often resulting in Class Vehicles drifting or jerking violently out of their lanes." (*Id.* ¶ 2.) According to Plaintiffs, "[d]rivers' inability to retain full steering control poses a serious risk of injury to the occupants and the surrounding cars or pedestrians." (*Id.* ¶ 50.)

Plaintiffs allege that Ford knew about the steering defect, not only from the "over one hundred complaints" that consumers filed online with the National Highway Traffic Safety Administration ("NHTSA"), but also from dealership repair records, warranty claims, and Ford's "own internal Case records, including pre-sale durability testing." (*Id.* ¶ 9.) Plaintiffs further allege that Ford not only knew about the F-150s' steering defect, but actively concealed it by not

---

[2] The facts in this section are taken from the Amended Complaint and construed in the light most favorable to Plaintiffs. *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).

disclosing the defect to customers who purchased F-150s, and not fixing the defect when customers later brought their F-150s to Ford dealerships for repairs. (Am. Compl. ¶¶ 5–7; 62–64.)

Ford itself has drawn attention to the steering properties of its F-150, advertising its "Lane-Keeping System" and "Electronic Power Assisted Steering," which are supposedly designed to help drivers stay in their lanes and steer their vehicles. (*Id.* ¶ 53.) Plaintiffs also cite four Ford technical service bulletins, issued between 2016 and 2018, that recommend various repairs for F-150 trucks built after 2015 that have drifting and pulling problems. (*Id.* ¶¶ 66–69.)

Plaintiff Lincoln's vehicular troubles allegedly began on July 4, 2018, when he purchased a 2016 F-150 from Millsboro Auto Mart ("Millsboro"), a Delaware dealership that was not Ford-authorized. (*Id.* ¶ 18.) Right away, Lincoln noticed the "truck would drift from side to side," but Millsboro assured him that it would remedy the drifting problem by performing an alignment. (*Id.* ¶ 19.) The alignment, and a subsequent tire rebalancing, failed to resolve the steering problem. (Am. Compl. ¶ 19.) Several days later, Lincoln brought his F-150 to Pittsville Ford, an authorized Ford dealership located in Maryland, "complaining that the 2016 Vehicle was 'all over the road' and jerking and pulling." (*Id.* ¶ 20.) The Pittsville dealership allegedly did not fix the steering issue, and refused to provide Lincoln with a refund when he said "he did not feel safe driving the 2016 Vehicle." (*Id.* ¶ 21.)

Instead, Pittsville Ford allegedly allowed Lincoln to trade in his 2016 F-150 for a 2017 F-150 that had about 10,000 more miles on its odometer than the 2016 truck. (*Id.* ¶¶ 23, 26.) Lincoln had paid $21,355 for the 2016 truck, received $19,836 from trading in that truck to Pittsville Ford, and paid $22,117 for the 2017 truck. (*Id.* ¶¶ 23, 25.) Lincoln allegedly test-drove the 2017 truck and once again "noticed that it pulled and drifted in both directions," but he bought the truck because the dealership informed him that a free realignment would remedy that problem. (Am.

3

Compl. ¶ 27.)  Once again, the defect allegedly persisted after the realignment, as well as after Pittsville Ford performed two subsequent repairs.  (*Id.* ¶ 28.)  Lincoln states that these repairs were covered under his warranty with Ford, and seeks damages not for the cost of repairs to his vehicle, but for the "diminished value of the 2016 Vehicle and the 2017 Vehicle, significant lost work time, and other consequential damages."  (*Id.* ¶¶ 28, 32.)  Lincoln alleges that, had he known about the F-150s' steering defect in advance, "he either would have not purchased the 2017 Vehicle or paid considerably less for it."  (*Id.* ¶ 33.)

Plaintiff Buege's story closely resembles Lincoln's.  In 2018, Buege, a New Mexico resident, purchased a new 2018 F-150 from an authorized Ford dealer in New Mexico.  (*Id.* ¶ 34.) Right after purchasing his vehicle, "he noticed it would drift from side to side."  (Am. Compl. ¶ 35.)  After allegedly complaining to two local Ford-authorized dealerships "about the steering pulling and drifting," and receiving several repairs, Buege observed that the steering defect persisted.  (*Id.* ¶¶ 37–40.)  Although Ford's warranty still allegedly applied to Buege's truck at the time of these repairs, the dealers charged him several hundred dollars for the repairs.  (*Id.* ¶¶ 37, 42.)  Buege seeks damages covering the "diminished value of the 2018 Vehicle, his out of pocket expenses for repairs, and other consequential damages."  (*Id.* ¶ 44.)

Ford provides a New Vehicle Limited Warranty ("NVLW") with its F-150 trucks, under which Ford promises to—without charging customers—repair defects that customers report within the lesser of 36,000 miles or three years of purchase.  (*Id.* ¶ 76.)  Ford also offers a "Certified Pre-Owned Warranty," which Plaintiffs describe as "a 12 month/12,000 mile bumper-to-bumper warranty, and a seven-year/100,000 mile powertrain warranty that covers defects in vehicle transmissions, engines or other powertrain components."  (Am. Compl. ¶ 77.)

## II.    *Legal Standards*

A motion to dismiss under Rule 12(b)(2) is a test of the Court's personal jurisdiction over the defendant. "[W]hen, as here, the court addresses the question [of personal jurisdiction] on the basis only of motion papers, supporting legal memoranda and the relevant allegations of a complaint, the burden on the plaintiff is simply to make a prima facie showing of a sufficient jurisdictional basis to survive the jurisdictional challenge." *New Wellington Fin. Corp. v. Flagship Resort Dev. Corp.*, 416 F.3d 290, 294 (4th Cir. 2005) (quoting *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989)). Objections to personal jurisdiction can be waived if they were available to the defendant and not raised in the defendant's first motion to dismiss under Rule 12(b). *See* Fed. R. Civ. P. 12(h).

"In considering a motion to dismiss" pursuant to Rule 12(b)(6), the Court must "accept as true all well-pleaded allegations and view the complaint in the light most favorable to the plaintiff." *Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir. 2005). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "A pleading that offers 'labels and conclusions' or . . . 'naked assertion[s]' devoid of 'further factual enhancement'" will not suffice. *Id.* (alteration in original) (quoting *Twombly*, 550 U.S. at 555, 557).

Under Rule 8(a)(2), to state a claim for breach of express or implied warranty, a plaintiff need only plead "a short and plain statement of the claim" that satisfies the plausibility standard. To state a claim for fraudulent misrepresentation, a plaintiff must do more. Under Rule 9(b), "[i]n

alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Those circumstances include "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Weidman v. Exxon Mobil Corp.*, 776 F.3d 214, 219 (4th Cir. 2015) (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999)).

### III.   Analysis

Preliminarily, the Court denies Defendants' first motion to dismiss (ECF No. 6), which is moot because Plaintiffs subsequently filed an amended complaint (ECF No. 9). With respect to Defendants' second motion to dismiss (ECF No. 15), the Court will dismiss without prejudice all of Buege's claims for lack of personal jurisdiction. The Court will also dismiss Lincoln's fraudulent concealment and duty of good faith and fair dealing claims under Delaware law. The Court will not dismiss Lincoln's Maryland Consumer Protection Act ("MCPA"), express warranty, implied warranty, and fraudulent concealment claims; his Delaware Consumer Fraud Act ("DCFA"), express warranty, and implied warranty claims; and his federal Magnuson-Moss Warranty Act ("MMWA") claim.

#### A.   Personal Jurisdiction

"A federal court sitting in diversity has personal jurisdiction over a non-resident defendant if (1) an applicable state long-arm statute confers jurisdiction and (2) the assertion of that jurisdiction is consistent with constitutional due process." *Nichols v. G.D. Searle & Co.*, 991 F.2d 1195, 1199 (4th Cir. 1993). Maryland courts have "consistently held" that Maryland's long-arm statute "is coextensive with the limits of personal jurisdiction set by the due process clause of the Federal Constitution." *Beyond Sys., Inc. v. Realtime Gaming Holding Co., LLC*, 878 A.2d 567, 576 (Md. 2005). For this reason, when "applying Maryland's long-arm statute, federal courts often

6

state that '[the] statutory inquiry merges with [the] constitutional inquiry.'" *Beyond Sys., Inc. v. Kennedy W. Univ.*, Civ. No. DKC-05-2446, 2006 WL 1554847, at *3 (D. Md. May 31, 2006) (alterations in original) (quoting *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396–97 (4th Cir. 2003)).

Two types of personal jurisdiction exist: general jurisdiction, based upon continuous and systematic activities by a defendant in the forum state, and specific jurisdiction, premised upon a defendant's contacts with the forum state when the suit arises out of those specific contacts. *Daimler AG v. Bauman*, 571 U.S. 117, 126–27 (2014). For a corporation, general jurisdiction tends to exist only where a corporation is "at home," which is at its place of incorporation and its principal place of business. *Id.* at 137.

Defendants are not at home in Maryland, as Ford Motor Company is incorporated in Delaware and headquartered in Michigan. (Am. Compl. ¶ 45.) However, consistent with Maryland's long-arm statute and the federal constitutional guarantee of due process, this Court has specific personal jurisdiction over Ford with respect to Lincoln's claims, which are premised on sales and repairs that occurred in Maryland. Defendants do not challenge this conclusion, but correctly assert that this Court lacks specific personal jurisdiction over Defendants with respect to Buege's New Mexico claims.

Although federal courts regularly adjudicate class action suits featuring *unnamed* plaintiffs residing in many states, the U.S. Supreme Court's ruling in *Bristol-Myers Squibb Co. v. Superior Court of Cal.*, 137 S.Ct. 1773 (2017), has prompted a growing number of courts to require each *named* plaintiff in a class action suit to establish personal jurisdiction over a defendant. In *Bristol-Myers Squibb*, the Supreme Court held that the Fourteenth Amendment's due process clause

7

prohibits *state* courts from asserting specific jurisdiction over claims of nonresident plaintiffs whose contacts with the forum state did not give rise to the lawsuit. *Id.* at 1781.

In March 2020, the U.S. Court of Appeals for the Seventh Circuit applied *Bristol-Myers Squibb*'s rule to a class action suit in *federal* court, holding: "We see no reason why personal jurisdiction should be treated any differently from subject-matter jurisdiction and venue: the named representatives must be able to demonstrate either general or specific personal jurisdiction, but the unnamed class members are not required to do so." *Mussat v. IQVIA, Inc.*, 953 F.3d 441, 447 (7th Cir. 2020).[3]  The Seventh Circuit's decision reinforced the majority rule across federal district courts. *See, e.g., Napoli-Bosse v. Gen. Motors LLC*, Civ. No. MPS-18-1720, 2020 WL 1677089, at \*3 (D. Conn. Apr. 6, 2020) ("I therefore join the majority of district courts to consider the issue and conclude that, because the non-resident [named] Plaintiffs have failed to allege that their claims arise out of [the defendant's] contacts with Connecticut, *Bristol-Myers* precludes this Court from exercising personal jurisdiction over their claims"); *Sloan v. Gen. Motors, LLC*, Civ. No. EMC-16-7244, 2019 WL 6612221, at \*9 (N.D. Cal. Dec. 5, 2019) ("The overwhelming majority of federal courts have held that Bristol-Myers applies to claims brought by named plaintiffs in class actions"); *Molock v. Whole Foods Mkt., Inc.*, 297 F. Supp. 3d 114, 125–26 (D.D.C. 2018).

In keeping with the majority of federal courts to address this issue, this Court will require each *named* plaintiff in a class action suit to demonstrate personal jurisdiction over a defendant. In contrast with Lincoln, Buege never purchased, drove, or sought repairs for his F-150 in Maryland. Because Buege's claims are based exclusively on alleged actions that occurred in New Mexico,

---

[3] Plaintiffs cite *Mussat* to highlight the Seventh Circuit's decision not to apply *Bristol-Myers Squibb* to *unnamed* members of class actions, without acknowledging the more applicable aspect of *Mussat*'s holding: that *Bristol-Myers Squibb* does apply to *named* members of a class action suit. (Opp'n Mot. Dismiss at 7.)

the Court dismisses all claims brought by Buege—under the New Mexico Unfair Trade Practices Act, MMWA, and New Mexico common law—without prejudice.

### B.  Adequacy of Pleading a "Defect"

Under Rule 12(b)(6), Defendants moved to dismiss several of Plaintiffs' claims on the grounds that they did not plausibly allege a "steering defect."   Defendants object to the characterization of the alleged defect as "latent," arguing that Plaintiffs allegedly noticed steering issues right after they purchased their respective trucks.  (Mot. Dismiss Mem. Supp. at 23–24, ECF No. 15-1.) Ford acknowledges that it issued technical service bulletins that describe F-150s pulling or wandering, but asserts that "there is nothing remarkable about the bulletins, as any vehicle can experience drift or pull," and Plaintiffs have not provided evidence tying those bulletins to the steering defect they allegedly experienced.  (*Id.* at 24.)  Instead, Ford argues that the alleged steering defect could simply reflect "the possibility of drivers' own misuse of their vehicles." (*Id.* at 26.)

Plaintiffs have sufficiently pleaded the existence of a steering defect under Rule 8(a)(2), the pleading standard that applies in products liability cases. *See, e.g., Ferro v. Volvo Penta of the Americas, LLC*, 731 F. App'x 208, 210 (4th Cir. 2018).  Plaintiffs do not make a conclusory assertion that they experienced a steering defect; they sufficiently describe the jerking, pulling, and loss of control that allegedly accompanied their attempts to steer their newly purchased F-150s. *See Bloom v. Depuy Orthopaedics, Inc.*, Civ. No. BEL-10-2170, 2011 WL 2712585, at *1 (D. Md. July 11, 2011) (holding that even a "sparse" description of how a medical product came apart put the manufacturer defendant on notice of the consumer plaintiff's claim and survived dismissal).

Ford's other arguments miss the mark. A company cannot escape liability for creating a dangerous product simply by arguing that consumers were aware of that danger soon after purchasing the product. Moreover, the facts as alleged by Plaintiff, together with the Ford bulletin describing drifting and pulling problems that F-150s can exhibit, state a plausible claim that a steering defect did occur. Whether Ford's F-150 trucks truly have a steering defect is a question of fact that will be resolved at a later stage.

### C. Maryland Consumer Protection Act

Lincoln alleges, on behalf of the Maryland class, that Ford violated the MCPA. (Am. Compl. ¶ 105.) The MCPA provides, "A person may not engage in any unfair, abusive, or deceptive trade practice . . . in [t]he sale, lease, rental, loan, or bailment of any consumer goods, consumer realty, or consumer services" or in an "offer for sale" of those goods or services. Md. Code Ann., Com. Law § 13–303. "Unfair, abusive, or deceptive trade practices" are broadly defined to include, *inter alia*, "[r]epresentation that . . . [c]onsumer goods, consumer realty, or consumer services are of a particular standard, quality, grade, style, or model which they are not"; "[f]ailure to state a material fact if the failure deceives or tends to deceive"; and "[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with [t]he promotion or sale of any consumer goods." *Id.* § 13–301.

In their motion to dismiss, Defendants argue that no "sale" occurred with respect to Lincoln's 2017 F-150, which he obtained in Maryland. The MCPA defines "sale" as "any (1) [s]ale of or offer or attempt to sell merchandise, real property, or intangibles for cash or credit; or (2) [s]ervice or offer for service which relates to any person, building, or equipment." *Id.* § 13–101(i). "Service," in turn, includes "any . . . repair of a motor vehicle." *Id.* § 13–101(j). Lincoln's

alleged trade of his 2016 truck for a 2017 model, which involved an outlay of $2,281, constituted an exchange of cash for merchandise,[4] and states a plausible claim that a sale occurred.

Defendants next argue that the alleged steering defect is not "material" for the purposes of the MCPA, because "by the time Lincoln traded in 2016 F-150 for the 2017 F-150, he had experienced, and therefore, had actual knowledge regarding, the steering characteristics of an F-150." (Mot. Dismiss Mem. Supp. at 20.) However, Ford cannot state that Lincoln somehow knew that the 2017 F-150 would have the alleged steering defect, when Pittsville Ford never pinpointed the cause of the alleged steering issues in Lincoln's 2016 F-150 or classified those alleged issues as a defect. Under the MCPA, "[a]n omission is considered material if a significant number of unsophisticated consumers would attach importance to the information in determining a choice of action." *Hayes v. Hambruch*, 64 F.3d 657 (4th Cir. 1995) (Table) (quoting *Golt v. Phillips*, 517 A.2d 328, 331 (Md. 1986)). It is very plausible that consumers would find it important that a truck's steering system can unexpectedly malfunction. Even if the standard for materiality were subjective rather than objective, Lincoln's decision to swap in his 2016 truck because he felt it was unsafe to drive clearly illustrates the materiality of Ford's alleged omission.

Alternatively, Defendants seek dismissal of Lincoln's MCPA claim to the extent that it is based on affirmative misrepresentations. (Mot. Dismiss Mem. Supp. at 22.) However, Plaintiffs concede that they "do not assert an affirmative misrepresentation claim," but "only omissions-based claims." (Opp'n Mot. Dismiss at 12, ECF No. 17.)

Thus, the Court will allow Lincoln's MCPA claim to proceed.

---

[4] The MCPA defines "merchandise" as "any commodity, object, wares, or goods." Md. Code Ann., Com. Law § 13–101(f).

### D. *Delaware Consumer Fraud Act*

On behalf of the Delaware class, Lincoln alleges that Defendants violated the DCFA. (Am.

Compl. ¶ 112.)  The DCFA states:

> The act, use or employment by any person of any deception, fraud, false pretense,
> false promise, misrepresentation, or the concealment, suppression, or omission of
> any material fact with intent that others rely upon such concealment, suppression
> or omission, *in connection with* the sale, lease or advertisement of any merchandise,
> whether or not any person has in fact been misled, deceived or damaged thereby, is
> an unlawful practice.

Del. Code Ann. 6 § 2513(a) (emphasis added).  Under the DCFA, a "sale" is defined as "any sale,

offer for sale or attempt to sell any merchandise for any consideration." *Id.* § 2511(8).  Stating a

claim under the DCFA requires showing that "(1) a defendant engaged in conduct which violated

the statute; (2) the plaintiff was a 'victim' of the unlawful conduct; and (3) a causal relationship

exists between the defendant's unlawful conduct and the plaintiff's ascertainable loss." *Teamsters*

*Local 237 Welfare Fund v. AstraZeneca Pharmaceuticals LP*, 136 A.3d 688, 693 (Del. 2016).

The DCFA's purpose is "to protect consumers and legitimate business enterprises from

unfair or deceptive merchandising practices in the conduct of any trade or commerce in part or

wholly within this State," and the DCFA "shall be liberally construed and applied to promote its

underlying purposes and policies." *Id.* § 2512.  In a similar vein, the DCFA broadly states, "A

private cause of action shall be available to any victim of a violation of this subchapter." *Id.* §

2525.

Federal Rule 9(b) governs pleadings under the DCFA, but federal courts interpreting

Delaware law have adopted a more relaxed Rule 9(b) standard for DCFA claims.  Such pleadings

need not list the date, time, and place of alleged instances of fraud, but instead satisfy Rule 9(b)

when "the circumstances of the alleged fraud are plead sufficiently 'to place defendants on notice

of the precise misconduct with which they are charged, and to safeguard defendants against

spurious charges of immoral and fraudulent behavior.'" *Coleman Dupont Homsey v. Vigilant Ins. Co.*, 496 F. Supp.2d 433, 439 (D. Del. 2007) (quoting *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984)).   The U.S. District Court for the District of Delaware has also articulated the DCFA's relaxed Rule 9(b) standard as "merely requir[ing] sufficient factual specificity to provide assurance that plaintiff has investigated and reasonably believes that a fraud has occurred." *Johnson v. Ace Cash Express Inc.*, Civ. No. LPS-13-1186, 2015 WL 4397482, at *3 (D. Del. July 17, 2015) (internal quotation marks and citations omitted).

Lincoln brings a DCFA claim "in connection with his purchase of his 2016 Vehicle in Delaware." (Am. Compl. ¶ 110.)   Lincoln has plausibly alleged that a sale occurred with respect to the 2016 Ford F-150 that he purchased in Delaware.   However, Defendants argue that Lincoln's DCFA claim should be dismissed because Ford did not participate in a sale when "Lincoln purchased his used 2016 F-150 from Millsboro Auto-mart, who is not a Ford-authorized dealership." (Mot. Dismiss Mem. Supp. at 19.)

Just as the DCFA broadly defines its purpose and scope, Delaware courts have interpreted this statute broadly.   The Delaware Supreme Court has held that "an unlawful act need only be done 'in connection with the sale' of merchandise," and § 2513(a) "does not require that the defendant profit or benefit from his fraudulent conduct." *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1075 (Del. 1983) (quoting Del. Code Ann. 6 § 2513(a)).   Similarly, the phrase "in connection with" need not require that a plaintiff "have been involved in the sale of the [merchandise in question] or have relied on defendant's advertisements." *Pack & Process, Inc. v. Celotex Corp.*, 503 A.2d 646, 658 (Del. Super. Ct. 1985).   Most DCFA claims do not involve a customer suing a manufacturer that indirectly sold merchandise through a third-party dealer, and neither Plaintiff nor Defendant cite any cases with that fact pattern.   Nevertheless, the District of

13

Delaware recently considered this question in *Arçelik A.Ş v. E.I. du Pont De Nemours and Company*, in which the plaintiff purchased dryers from a third-party retail seller, and those dryers contained an allegedly defective product manufactured by the defendant. Civ. No. LPS-15-961, 2018 WL 1401327, at *1 (D. Del. Mar. 20, 2018). The District of Delaware denied dismissal of the plaintiff's DCFA claim, holding that, "as an indirect customer of [the defendant's] product," the plaintiff challenging the defendant's actions in connection with the sale of the product "may seek protection under the required liberal construction of the DCFA." *Id.* at *8.

Because the DCFA does not require that a defendant directly sell merchandise to a plaintiff, Lincoln states a plausible claim that Ford's alleged concealment of a steering defect, in connection with the sale of its F-150 trucks in Delaware, violated the DCFA. Lincoln's pleading satisfies Delaware courts' relaxed Rule 9(b) standard because the Amended Complaint also provides Ford with notice of its alleged misconduct—namely, allegedly actively concealing that its customers experienced unexpected jerking, pulling, and loss of control when steering their F-150s. Lincoln also points to various sources—including customers' complaints, warranty claims, and even Ford's own technical service bulletins—through which Ford plausibly learned of this alleged steering defect. (*Id.* ¶ 9.)

As with Lincoln's MCPA claims, Ford is correct in asserting that Lincoln identified particular omissions on Ford's part, but did not identify an actionable affirmative representation in Ford's advertisements. However, Lincoln's acknowledgment that he objects to Ford's omissions, rather than its representations, reflects that both parties agree on this issue.

Thus, the Court will not dismiss Lincoln's DCFA claim.

### E. Express Warranty

Defendants argue that Lincoln's breach of express warranty claims under Maryland and Delaware law should be dismissed because Lincoln did not adequately allege a breach. For the reasons set forth below, the Court declines to dismiss these claims.

#### 1. Maryland

In Maryland, stating a claim for breach of express warranty requires alleging that "1) a warranty existed; 2) the product did not conform to the warranty; and 3) the breach proximately caused the injury or damage." *Robinson v. Am. Honda Motor Co.*, 551 F.3d 218, 223 (4th Cir. 2009) (quoting *SpinCycle, Inc. v. Burcin Kalender*, 186 F. Supp. 2d 585, 589 (D. Md. 2002)). Maryland has adopted a Uniform Commercial Code ("UCC") provision stating, "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." Md. Code Ann., Com. Law § 2–313(1)(a).

In *Coastal Modulator Corp. v. Laminators, Inc.*, the U.S. Court of Appeals for the Fourth Circuit allowed customers to recover on a breach of express warranty claim when the repairs offered by the defendants failed their "essential purpose." 635 F.2d 1102, 1106 (4th Cir. 1980) (quoting Md. Code Ann., Com. Law § 2–719(2) ("Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had . . . ")). The Fourth Circuit has stated "that a repair remedy fails of its essential purpose when the seller 'has refused to make repairs as he was required or where he cannot repair the product.'" *Baney Corp. v. Agilysys NV, LLC*, 773 F. Supp. 2d 593, 605 (D. Md. 2011) (quoting *Riegel Power Corp. v. Voith Hydro*, 888 F.2d 1043, 1046 (4th Cir. 1989)).

Lincoln alleges that Ford breached the NVLW, an express warranty, "by selling and leasing Class Vehicles with the Defect, requiring repair or replacement within the applicable warranty

15

periods, and refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods." (Am. Compl. ¶ 130.) Plaintiffs add that "Ford breached the express warranties by failing to repair the Steering Defect despite multiple opportunities to do so." (Opp'n Mot. Dismiss at 29.)

Along with their motion to dismiss, Defendants seek judicial notice of several exhibits, including Ford's NVLWs from 2016 through 2018. The Fourth Circuit permits judicial notice of documents attached to a motion to dismiss "so long as they are integral to the complaint and authentic." *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). The Court will take judicial notice of Ford's 2016, 2017, and 2018 NVLWs, (Mot. Dismiss Exs. C–E, ECF Nos. 15-6, 15-7, 15-8), because the language of those warranties—which were issued by Ford itself— is integral to Lincoln's breach of express warranty claim.[5]

Ford's 2016, 2017, and 2018 NVLWs do not expressly warrant that Ford's cars will be free of defects, or that defects will not arise during the warranty period. Also, only Buege alleges that he had to pay for repairs during the warranty period, and his claims have been dismissed for lack of personal jurisdiction. However, the 2016, 2017, and 2018 NVLWs do assert that "Ford provides the New Vehicle Limited Warranty in order to *remedy any such defects that result in vehicle part malfunction or failure* during the warranty period," and "Ford and its authorized dealers are entitled to a reasonable time and a reasonable number of attempts within which to *diagnose and repair any defect* covered by this warranty." *Id.* (emphases added).

Lincoln has stated a claim for breach of express warranty, sufficient to satisfy Rule 8(a)(2)'s pleading requirement, on the ground that Ford allegedly failed to repair Lincoln's F-150,

---

[5]  However, the Court will not take judicial notice of proposed exhibits A and B, which contain screenshots from YouTube videos that Plaintiffs referenced in their complaint. (Mot. Dismiss Exs. A–B, ECF Nos. 15-4, 15-5.) These screenshots do not unequivocally convey the swerving or jerking motions that Plaintiffs claim the YouTube videos reflect. These videos would be more appropriate to consider at the summary judgment stage.

despite the NVLW's apparent promise that Ford will remedy defects in its F-150s. The NVLW's language about remedying defects strongly resembles *Baney*'s statement that a manufacturer may be liable for breaching an express warranty by not adequately repairing a product.

### 2. *Delaware*

Delaware law contains the same UCC provision as Maryland. *See* Del. Code Ann. 6 § 2–313(1)(a) ("Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise."). As in Maryland, a breach of express warranty can occur under Delaware law when a defendant "fails" to achieve the "essential purpose" of a warranty. *Burton v. Chrysler Group LLC*, Civ. No. LPS-12-5, 2014 WL 4253135, at *5 (D. Del. Aug. 27, 2014). When a warranty calls for "the repair or replacement of defective parts," the warranty fails its essential purpose "where the warrantor refuses to repair the vehicle, the vehicle is not repaired within a reasonable time or the vehicle is not repaired in a reasonable number of attempts." *Id.* at *5.

Lincoln's Delaware express warranty claim provides a plausible basis for recovery on the ground that Defendants allegedly failed to effectuate the NVLW's essential purpose by not repairing the steering defect. Whether the F-150 truly contained a steering defect, and whether the Ford-authorized Pittsville dealership repaired that defect within a reasonable time or a reasonable number of attempts, are all questions of fact that will be resolved at a later stage.

Thus, Lincoln's Maryland and Delaware express warranty claims will not be dismissed.

### F. *Implied Warranty*

Lincoln alleges that Defendants, by selling vehicles with a safety defect, breached the implied warranty of merchantability under both Maryland and Delaware law. For the reasons

discussed below, the Court will deny Defendants' motion to dismiss with respect to these implied warranty claims.

### 1. Maryland

Establishing a breach of implied warranty of merchantability under Maryland law requires showing that "(1) a warranty existed; (2) the product did not conform to the warranty . . . and (3) the breach of warranty by the seller was the cause of the injury to the user or third party." *Lloyd v. Gen. Motors Corp.*, 916 A.2d 257, 286 (Md. 2007). Additionally, Maryland law, through the UCC, requires buyers to provide sellers with notice of a breach of this implied warranty within a reasonable time. Md. Code Ann., Com. Law § 2–607(3)(a). Maryland courts require buyers to "inform the seller of the breach, [and] the particular goods that have been impaired, and set forth the nature of the nonconformity," or in other words, "notify their immediate seller of the breach." *Doll v. Ford Motor Co.*, 814 F. Supp. 2d 526, 542 (D. Md. 2011) (emphasis omitted).

Defendants argue that Lincoln failed to provide Ford with reasonable notice because he did not notify Ford that his F-150 had a steering defect before filing his Complaint. However, Lincoln alleges that he repeatedly informed both of his dealers, including the Ford-authorized Pittsville, about the steering defects he was experiencing, and *Doll* clarified that notifying an immediate seller provides sufficient notice. Informing a Ford-authorized dealership of a defect is functionally equivalent to informing Ford Motor Company of that same defect. Through Lincoln's alleged calls and visits to both dealerships, he adequately conveyed that the "nature of the nonconformity" in his F-150 was a steering defect. (Am. Compl. ¶ 43.) Additionally, given that Lincoln allegedly notified each dealer about the steering defect within days of his purchase of both Ford F-150s, Lincoln's claim plausibly satisfies the temporal reasonableness requirement in § 2–607(3)(a).

Beyond sufficiently pleading that he provided the requisite notice to bring a breach of implied warranty claim, Lincoln has plausibly stated a claim that Defendants breached the implied

warranty of merchantability. This implied warranty applies to a "merchant who deals in goods of that kind," and requires that those goods "[p]ass without objection in the trade under the contract description" and "be fit for the ordinary purpose for which such goods are used." Md. Code Ann., Com. Law § 2–314(1). In cases involving automobiles, "the implied warranty of merchantability is simply a guarantee that they will operate in a safe condition and substantially free of defects." *Carlson v. Gen. Motors Corp*., 883 F.2d 287, 297 (4th Cir. 1989). Lincoln has adequately pleaded that Ford's F-150s, because their drivers can allegedly experience "severe pulling and/or jerking of the steering wheel," are "not fit for their ordinary and intended purpose of providing Lincoln and the other members of the State Classes with reliable, durable, and safe transportation." (Am. Compl. ¶¶ 139, 141.)

### *2. Delaware*

Under Delaware law, establishing a breach of an implied warranty of merchantability requires showing "(1) that a merchant sold the goods; (2) that such goods were not 'merchantable' at the time of the sale; (3) that the plaintiff was damaged; (4) that the damage was caused by the breach of warrant of merchantability; and (5) that the seller had notice of the damage." *Reybold Group, Inc. v. Chemprobe Techs., Inc.*, 721 A.2d 1267 (Del. 1998). As does Maryland, Delaware defines the "notice" element using the UCC's language: "Where a tender has been accepted . . . the buyer must within a reasonable time after he or she discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." Del. Code Ann. 6 § 2–607(3)(a).

Delaware courts interpret the UCC's notice requirement relatively leniently. The Delaware Supreme Court has held that whether a notice given under § 2–607 occurs within a "reasonable time" is "a question of fact for the jury, and even "two, three and four year" gaps between buyers' discovery of a defect and provision of notice to sellers may be reasonable. *Mercedes-Benz of N.*

*America. Inc. v. Norman Gershman's Things to Wear*, 596 A.2d 1358, 1363 (Del. 1991). *See also Cline v. Prowler Indus. of Md.*, 418 A.2d 968 (Del. 1980) ("The requirement of notice has been greatly liberalized to reflect the differences between commercial buyers and consumers"); Official Cmts. 4 and 5 to Del. Code Ann. 6 § 2–607(3)(a) ("[T]he rule requiring notification is designed to defeat commercial bad faith, not to deprive a good faith consumer of his remedy . . . "). While a plaintiff must provide a "seller" with notice of his or her *individual* injury, rather than alleging the defendant received notice through other customers' online complaints, *see Theis v. Viewsonic Corp.*, Civ. No. RGA-12-1569, 2013 WL 1632677, at *1 (D. Del. Apr. 16, 2013), Delaware courts do not require that this notice be given directly to a manufacturer or to a defendant.

Again, Defendants argue that Lincoln failed to provide Ford with notice of the alleged steering defect within a reasonable time. Given the allegations that Lincoln informed a Ford-authorized dealer of his personal experience with his F-150's steering defect immediately after his purchase, and also informed Ford itself of this issue by filing this lawsuit about a year later, Lincoln's pleading has sufficiently satisfied § 2–607's notice requirement.

Thus, Lincoln's Maryland and Delaware breach of implied warranty of merchantability claims will not be dismissed.

### G. Magnuson-Moss Warranty Act

The MMWA, 15 U.S.C. § 2301 *et seq.*, sets forth a federal cause of action for breaches of express and implied warranties. Under the MMWA, "a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this chapter, or under a written warranty, implied warranty, or service contract, may bring suit," provided that all individual claims have at least $25 in controversy and the total amount in controversy, aggregated

across all claims, is at least $50,000. *Id.* § 2310. When resolving claims under the MMWA, courts apply *state* law on express and implied warranties. *Carlson*, 883 F.2d at 291.

Lincoln pleads that his individual claims, and the aggregate value of the class's claims, each exceed their respective amount in controversy requirements.[6] (Am. Compl. ¶ 153.) Because the MMWA derives from—and requires the same analysis as—state law warranty claims, and Lincoln has plausibly asserted express and implied warranty claims under Maryland and Delaware law, Lincoln's MMWA claim will not be dismissed.

### H. Fraudulent concealment

Lincoln alleges that Defendants fraudulently concealed information about a steering defect in their F-150 trucks. As explained below, the Court will not dismiss Lincoln's claim under Maryland law, but will dismiss his Delaware claim because it does not meet the heightened pleading standard that Delaware applies to fraudulent concealment claims.

### 1. Maryland

In Maryland, the "essential elements of fraudulent concealment include: (1) the defendant owed a duty to the plaintiff to disclose a material fact; (2) the defendant failed to disclose that fact; (3) the defendant intended to defraud or deceive the plaintiff; (4) the plaintiff took action in justifiable reliance on the concealment; and (5) the plaintiff suffered damages as a result of the defendant's concealment." *Doll*, 814 F. Supp. 2d at 537. While Federal Rule 9(b) applies to claims of fraud, federal courts applying Maryland law have adopted a more relaxed Rule 9(b) standard "in fraudulent concealment cases where the concealment involves omissions of material fact,"

---

[6] Defendants do not challenge Plaintiffs' claim that over $50,000 is in controversy. Regardless, in federal courts, the amount in controversy "claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal." *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288–89 (1938); *Pyskaty v. Wide World of Cars, LLC*, 856 F.3d 216, 229–230 (2d Cir. 2017) (applying *St. Paul*'s reasoning to a claim under the MMWA).

because "omissions cannot be described in terms of the time, place, and contents of the misrepresentation." *Shaw v. Brown & Williamson Tobacco Corp.*, 973 F. Supp. 539, 552 (D. Md. 1997). This relaxed Rule 9(b) requirement still effectuates a key purpose of Rule 9(b), which is to "provide the defendant fair notice of the basis of plaintiff's claim." *Swedish Civil Aviation Admin. v. Project Mgmt. Enters., Inc.*, 190 F. Supp. 2d 785, 798 (D. Md. 2002). A complaint that is "thorough" and pleads "alleged fraudulent behavior with specificity" can meet the relaxed Rule 9(b) requirement for fraudulent concealment claims under Maryland law. *Id.* at 799.

Lincoln did allege a fraudulent concealment claim with sufficient particularity to satisfy the relaxed Rule 9(b) pleading requirement. In his complaint, Lincoln described the nature of the F-150's steering defect and cited various sources through which Ford should have learned of this defect. Lincoln's complaint clearly describes his fraudulent concealment claim, effectuating Rule 9(b)'s purpose of providing Ford with fair notice of this claim.

Plaintiff also sufficiently pleads the other elements of a fraudulent concealment claim. The federal Motor Vehicle Safety Act creates a duty to disclose on Defendants' part. Under that statute, "[a] manufacturer of a motor vehicle or replacement equipment shall notify. . . the owners, purchasers, and dealers of the vehicle or equipment" if "the vehicle or equipment contains a defect and decides in good faith that the defect is related to motor vehicle safety." 49 U.S.C. § 30118(c). Further, Lincoln alleges that Defendants "did not fully and truthfully disclose to their customers the true nature of the inherent defect"; Defendants made their omissions "with knowledge of their falsity, and with the intent that Plaintiff and the members of the State Classes rely on them"; and Lincoln and the Maryland class members "reasonably relied on these omissions and suffered damages as a result." (Am. Compl. ¶ 45.)

### 2. *Delaware*

In Delaware, to claim fraudulent concealment, a plaintiff must establish "(1) the defendant deliberately concealed a material fact or remained silent in the face of a duty to speak, (2) the defendant acted with scienter, (3) the defendant had an intent to induce plaintiff's reliance upon the concealment, (4) causation, and (5) plaintiff suffered damages resulting from the concealment." *Vatidis v. Trimble, Inc.*, Civ. No. MN-18-998, 2019 WL 3546693, at \*4 (D. Del. Aug. 5, 2019) (quoting *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149 (Del. 1987)). Under Delaware law, fraudulent concealment must be pleaded with particularity pursuant to Rule 9(b). *Id.* Moreover, Delaware law bars "recovery in tort for purely economic loss caused by a defective product." *Lima Delta Co. v. Gulfstream Aerospace Corp.*, Civ. No. MMJ-N14C-02-042, 2019 WL 624589, at \*1 (Del. Super. Ct. Feb. 13, 2019).

Without reaching the economic loss doctrine, the Court concludes that Lincoln has failed to adequately plead a claim for fraudulent concealment under Rule 9(b). Lincoln did not state the particular time and place when Ford allegedly concealed material facts from him, and did not even allege with any specificity the names of Does 1 through 10. Thus, the Court dismisses Lincoln's Delaware fraudulent concealment claim.

### I. *Delaware Duty of Good Faith and Fair Dealing*

Under Delaware law, "an implied duty of good faith and fair dealing is interwoven into every contract." *Walgreen, Co. v. Theranos, Inc.*, Civ. No. MPT-16-1040-RGA, 2017 WL 3189006, at \*5 (D. Del. July 27, 2017). Despite the seeming ubiquity of this implied covenant, it applies only in "limited and extraordinary" circumstances when it is clear that the parties reasonably expected to include obligations in a contract, but did not literally write down those obligations. *Nemec v. Shrader*, 991 A.2d 1120, 1128 (D. Del. 2010); *Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Systems Co.*, 708 A.2d 989, 992 (Del. 1998). "'[G]ood faith' does not

23

envision loyalty to the contractual counterparty, but rather faithfulness to the scope, purpose, and terms of the parties' contract," and "fair dealing" does not describe "whether the fiduciary acted fairly when engaging in the challenged transaction," but "rather a commitment to deal 'fairly' in the sense of consistently with the terms of the parties' agreement and its purpose." *Gerber v. Enter. Prods. Holding, LLC*, 67 A.3d 400, 418–19 (Del. 2013) (emphases omitted), *overruled on other grounds by Winshall v. Viacom Intern., Inc.*, 76 A.3d 808 (Del. 2013). Stating a claim for breach of this implied covenant requires "alleg[ing] a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff." *Theranos*, 2017 WL 3189006, at *5.

Lincoln alleges, on behalf of the Delaware class, that the implied covenant of good faith and fair dealing:

> required Ford to act in good faith, including, but not limited to, notifying consumers of the Steering safety Defect, and not selling or leasing such vehicles with the known safety Defect; a duty to repair the Defect in vehicles covered by express or implied warranty; and a duty to fully and adequately repair and replace defects related to vehicle safety.

(Am. Compl. ¶ 166.)

In its express warranties for new and used vehicles, Ford promised to pay for—and make—repairs to the F-150 during its warranty period. Because Ford *expressly* covenanted to fund and undertake repairs, this guarantee cannot, by definition, also be a subject of an *implied* covenant. As for the weighty obligations that Lincoln seeks to imply in Ford's warranties, he presents no explanation as to why both Ford and its customers would have "reasonably expected" the NVLW to guarantee that Ford's F-150s were free of known defects, and that Ford would notify consumers of any defects that arose. Instead, Lincoln incorrectly invokes an everyday meaning of "good faith," stating that Ford "acted in bad faith and/or with a malicious motive," (*id.* ¶ 168), and later,

24

"[p]laintiffs' allegations that Ford sought to profit by disregarding the safety of Plaintiffs and other Class members clearly amount to bad faith."[7]   (Opp'n Mot. Dismiss at 28.)   The Court will not apply the limited and extraordinary remedy of reading into a contract new terms that warrant a particular quality of good, or a certain quality of repairs.

Thus, this Court dismisses Lincoln's claim of breach of an implied covenant of good faith and fair dealing.

### IV.    Conclusion

For the foregoing reasons, an order shall enter (1) denying as moot Defendants' First Motion to Dismiss (ECF No. 6); and (2) granting in part and denying in part Defendant's Second Motion to Dismiss (ECF No. 15).

DATED this 29th day of September, 2020.

BY THE COURT:

James K. Bredar
Chief Judge

---

[7] Notably, Plaintiffs rely on two precedents holding that a car manufacturer's failure to disclose a defect amounted to a claim for a breach of the implied covenant of good faith and fair dealing, but both cases arose under New Jersey law, not Delaware law. (See Opp'n Mot. Dismiss at 28.)